# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of Committed Intimate Relationship of | No. 82556-9-I |
| LEE JORGENSEN, | DIVISION ONE |
| Appellant, | UNPUBLISHED OPINION |
| and | |
| NATALIE SEARS, | |
| Respondent. | |

APPELWICK, J. — Jorgensen appeals the trial court's summary dismissal of his petition for an equitable property distribution following the end of a committed intimate relationship with Sears. He argues that the trial court erred by concluding as a matter of law that the parties' relationship was not a committed intimate relationship. Because reasonable persons could reach different conclusions as to this threshold issue, we reverse and remand for further proceedings.

## FACTS[1]

Lee Jorgensen and Natalie Sears met in March 2005, when Jorgensen was a deckhand aboard a yacht moored on a dock where Sears often worked as a boat detailer. It is undisputed that Sears started her boat detailing business, Deckhand

---

[1] Because this is an appeal from a summary judgment order, we present these facts in the light most favorable to Jorgensen, the nonmoving party. See Right-Price Recreation, LLC. v. Connells Prairie Cmty. Council, 146 Wn.2d 370, 381, 46 P.3d 789 (2002) ("When reviewing an order of summary judgment . . . , [t]he reviewing court considers the facts and all reasonable inferences from those facts in the light most favorable to the nonmoving party.").

Citations and pin cites are based on the Westlaw online version of the cited material.

Detailing LLC, well before she met Jorgensen. Jorgensen, who had owned a detailing company before, began washing and waxing boats for Sears sometime after he met her.

According to Jorgensen, by winter 2005 he had worked with Sears "for months," their relationship had become romantic, and they were "very much in love." At the time, Sears was still married, and she asked Jorgensen to keep their relationship "quiet." However, Jorgensen and Sears "didn't really act like" Sears was still married. Indeed, at some point early in their relationship, Jorgensen proposed marriage to Sears. Sears initially said yes but later retracted, indicating "it felt odd to her that she had a fiancée while she was still legally married."

Jorgensen later declared that by May 2006, he and Sears were planning their lives together. They also discussed Jorgensen taking on a larger role in the boat detailing business. In e-mails from summer 2006, Sears wrote to Jorgensen, "Just think how much more I (uh, I mean, we) could gross if I had someone to help me manage everything and do some of the work." In another e-mail, Sears proposed that Jorgensen "take over part of [her] business while [she] take[s] care of the 'wizard of Oz' work (bookkeeping, marketing, etc) and plan[s] other ventures." And, in another, Sears stated she wanted the business to ultimately gross "a lot of money so we can qualify for a nice property to buy in the future," but in the meantime, it "still has to [net] enough that we have a comfortable paycheck to live off of." In response, Jorgensen indicated it would be a "good thing" for him to start out as Sears's "arms and legs," letting Sears do "mostly just the heady

2

business side of things" while Jorgensen "took on most of the . . . cleaning the boats side of things." Jorgensen indicated that he hoped the two would ultimately divide the work, with Sears handling "50% washes and all books, schedule and supplies" and Jorgensen handling "50% washes {working towards all washes and crew details so your share takes up about two hours of your day} and all waxing plus new account acquisition." Jorgensen also wrote, "[A]s long as I can pay my rent, cell, gas, insurance and car bills and buy a few meals then the rest of the income is wasted on me and I'm willing to freely let it go into a cookie jar for later use by the two of us." E-mails from that period reflect that the parties not only discussed their plans for the boat detailing business, but also shared emotional and physical intimacy.

At the time, Jorgensen lived between a boat in Seattle and a home in Chelan, an arrangement he later described as a "logistics nightmare." Jorgensen and Sears began looking at properties in Cle Elum and "discussed living there together." Meanwhile, Sears had started talking to her husband about her relationship with Jorgensen.

In November 2006, Sears and her husband purchased a cabin in Cle Elum.

In March 2007, Sears and her husband separated. According to Jorgensen, Sears moved into the Cle Elum cabin around that time, and Jorgensen began to stay there nightly as well. Jorgensen declared that for a time, he would return to Chelan when weather permitted to do laundry and visit his animals, but by June 2007, he and Sears were living together full time at the cabin. Jorgensen and

3

Sears would commute to Seattle in two vehicles, with Jorgensen stopping in Kirkland to pick up an employee and then driving to Seattle to work. Jorgensen would then drop the employee off at the end of the day before driving home to Cle Elum.

In February 2008 a court dissolved Sears's marriage and awarded Sears the Cle Elum cabin and the business, Deckhand Detailing. Meanwhile, according to Jorgensen,

> [L]iving together in Cle Elum and driving into Seattle daily . . . was becoming expensive and we believed we should buy a small condo or tiny home outside the city. We were looking since 2005 but there were some things that needed to happen first. My credit was horrible, and [Sears] was paying me cash under the table. She was almost finished with her divorce and asked [her husband] to help her one last time as a condition of their divorce agreement. He agreed to cosign on [a] condo on Queen Anne.

Sears purchased the Queen Anne condo in January 2008, and Sears's former husband later quitclaimed any interest in the condo to Sears.

Jorgensen and Sears moved into the Queen Anne condo in June 2008. They continued to live together until at least 2019, with two exceptions. In 2009, Jorgensen "met a girl . . . at a boat show" and texted with her for a time. When Sears saw the texts, she was "not happy with" Jorgensen, and the two "were in a bad spot for a few months." During this time, Jorgensen "would live at the cabin while [Sears] stayed at the condo or the opposite if plans changed." But, the two "sought help in dealing with [their] relationship and a short time afterward had recovered and resumed . . . as if nothing ever happened." Later, in 2014, Jorgensen began flirting with a woman over text. Jorgensen ended the text

4

communications after he learned that the woman "was [a] professional working girl." When Sears discovered the texts, she was "understandably upset" and "initially wanted to break up." But, instead, Sears and Jorgensen "lived apart for a while," taking turns between the cabin and the condo. The two "lived like this for two to three months," sought counseling, and, by the end of the year, "were affectionate again and saying I love you to each other."

Meanwhile, Jorgensen and Sears continued working together in the boat detailing business. According to Jorgensen, Sears referred to the business as "'our business,'" and the two operated it as a joint effort. In e-mails from 2010, 2012, and 2017, Sears introduced Jorgensen to third parties as her "business partner," her "business partner who does all the waxing," and her "business partner and lead wax detailer." A company employee later declared that Jorgensen "took care of most of the hands-on operations of the business while [Sears] worked behind the curtains."

Jorgensen attested that he engaged in active efforts to grow the business. He trained employees, handed out "almost 1,500 business cards in a season," "[t]alked to everyone," doing "test spots for people just to earn business," and "work[ed] for free to establish [their] reputation." He declared that by 2007, his "wax sales were equal to what the company's gross sales brought in for the year 2004." By 2011, his crew "made more in sales than all of the company's sales in 2004 and 2005, and more than Deckhand Detailing . . . made in 2006 and 2007." Jorgensen attested that he helped Sears write a book about boat detailing that was

5

later used to market the business, secured new clients, and worked with a manufacturer to develop a new polisher. In exchange, the business received free polishers whenever it needed them and was able to "brag about [their] involvement in [the polisher's] development." Sears involved Jorgensen in discussions about potential product distributorships, and when the business sold a franchise in California in 2017, Jorgensen flew down and spent two weeks with the franchisee. Jorgensen declared, "I stayed late and worked hard knowing we were benefiting from my efforts to improve our business," and he and Sears "talked about building the business and either retiring if it ran itself or selling it and using the proceeds to retire." He declared that he received "more an allowance than a paycheck," but he "was happy" and "let the benefit to [him and Sears] outweigh [his] personal need to make or spend much money at all."

By 2017, Jorgensen was "over-stretched and stressed out from work." Sears "noticed [Jorgensen] was at [his] limits" and indicated, "[i]n her words, 'I know that on a regular basis, you're not grumpy at me but you're grumpy and angry at everything around you. The bikes, annoying neighbors, people not parking right, living in the city in general.'" The two "talked about many ways of making more time for us," including "build[ing] a new and easier life out in Eastern Washington," and "starting an RV [recreational vehicle] custom shop to run, where we could build custom trailers." In August 2019, Jorgensen and Sears explored purchasing a commercial property in Cle Elum. This purchase never materialized, and it is undisputed that, in January 2020, Sears ended her relationship with Jorgensen.

6

In April 2020, Jorgensen filed a petition alleging that his relationship with Sears constituted a committed intimate relationship (CIR). Jorgensen requested an equitable distribution of property, specifically, the Queen Anne condo, the Cle Elum cabin, and Deckhand Detailing.

Sears moved for summary judgment, arguing that as a matter of law, Jorgensen could not establish that his relationship with Sears was a CIR. The trial court agreed with Sears, concluding, "This relationship does not meet the definition of a Committed, Intimate Relationship within the meaning of the law." So, the court summarily dismissed Jorgensen's petition. Jorgensen appeals.

## DISCUSSION

Jorgensen contends the trial court erred by concluding as a matter of law that his relationship with Sears was not a CIR and, thus, by summarily dismissing his petition. We agree.[2]

"Whether the court properly granted summary judgment is a question of law that we will review de novo." In re Kelly, 170 Wn. App. 722, 731, 287 P.3d 12 (2012). "A summary judgment motion . . . can be granted only if the pleadings, affidavits, depositions, and admissions on file demonstrate no genuine issues of

---

[2] Sears points out that Jorgensen's opening brief contains almost no citations to the record. This is true. However, the scope of our review in this case is limited to a single issue that was decided on summary judgment, and the record is not voluminous. So, we are unpersuaded by Sears's assertion that Jorgensen's failure "wholly undermin[es] the purpose of the rules of appellate procedure." Consequently, we decline Sears's invitation to resolve this appeal based on Jorgensen's noncompliance with the rules. See RAP 1.2(a) ("Cases and issues will not be determined on the basis of compliance or noncompliance with these rules except in compelling circumstances where justice demands.").

7

material fact, and that the moving party is entitled to judgment as a matter of law." Vasquez v. Hawthorne, 145 Wn.2d 103, 106, 33 P.3d 735 (2001). "The court must consider all facts submitted and all reasonable inferences from those facts in the light most favorable to the nonmoving party." Id. "The motion should be granted only if, from all the evidence, reasonable persons could reach but one conclusion." Id.

Here, reasonable persons could reach more than one conclusion about whether the parties' relationship was a CIR. Accordingly, the trial court erred by deciding that issue as a matter of law.

"The CIR doctrine is a judicially created doctrine used to resolve the property distribution issues that arise when unmarried people separate after living in a marital-like relationship and acquiring what would have been community property had they been married." Kelly, 170 Wn. App. at 731. Under the doctrine, a trial court decides property distribution issues in three steps: First, the court determines whether a CIR existed. Connell v. Francisco, 127 Wn.2d 339, 349, 898 P.2d 831 (1995). If so, "the trial court then: (1) evaluates the interest each party has in the property acquired during the relationship, and (2) makes a just and equitable distribution of the property." Id.

The first step—determining if a CIR exists—is a mixed question of law and fact. See In re Marriage of Pennington, 142 Wn.2d 592, 602-03, 14 P.3d 764 (2000) (determination of whether facts give rise to a "meretricious relationship" is "a mixed question of law and fact"). "A CIR is a 'stable, marital-like relationship

where both parties cohabit with knowledge that a lawful marriage between them does not exist.'" Kelly, 170 Wn. App. at 731 (quoting Connell, 127 Wn.2d at 346). "Five factors are relevant to the existence of a CIR: 'continuous cohabitation, duration of the relationship, purpose of the relationship, pooling of resources and services for joint projects, and the intent of the parties.'" Morgan v. Briney, 200 Wn. App. 380, 388, 403 P.3d 86 (2017) (quoting Connell, 127 Wn.2d at 346). These so-called "Connell factors" are "not exclusive, and no one factor is more important than the others." Id. The Connell factors also are not "hypertechnical." Pennington, 142 Wn.2d at 602. Rather, they are "meant to reach all relevant evidence helpful in establishing whether a [CIR] exists." Id. Accordingly, whether a particular relationship is a CIR "depends upon the facts of each case." Id.

Here, reasonable persons could determine that the first two Connell factors, continuous cohabitation and duration of the relationship, support a CIR. Jorgensen declared that he and Sears were living together in Cle Elum by April 2007, and he had moved into the cabin full time by June 2007. And, with the exception of two periods of a few months each, he and Sears continued to live together for at least 12 years. Furthermore, Jorgensen declared that during the two breaks in cohabitation, he and Sears attempted to reconcile and, during the 2014 break, sought counseling. While the trial court determined that the two breaks were "significant," that determination fails to view the evidence in the light most favorable to Jorgensen. Cf. Morgan, 200 Wn. App. at 388 (observing that, "[i]n the context of an almost 20-year relationship, an 8-month separation is not very significant"

9

where the parties remained in contact even while not living together, thus suggesting they "still intended to be in a romantic relationship").

Reasonable persons could further determine that the third and fifth factors, the relationship's purpose and the parties' intent, also support a CIR. Although Jorgensen and Sears never married, Jorgensen attested that the two acted like a married couple. He declared that the two "expressed to one another [their] love for each other" throughout their relationship, were "there for each other in good times and bad," and "made financial decisions together about money, paying bills, buying property, vehicles." Jorgensen declared that he and Sears "spoke often of [their] long-term plans for life," and "discussed dividing revenue from the business or that we would have a nice retirement someday." They traveled together to Europe on multiple occasions, including one trip with Jorgensen's parents during which his parents met Sears's parents, who were living in Switzerland. They shared pets during their relationship and grieved their losses together, and, in 2019, discussed buying a commercial property in Cle Elum where they could start an RV custom shop. Additionally, and as discussed, Jorgensen declared that on the two occasions when he and Sears lived apart due to Jorgensen's suspected infidelity, they made affirmative efforts to mend their relationship, indicating their commitment to one another. Cf. In re Muridan, 3 Wn. App. 2d 44, 60-61, 413 P.3d 1072 (2018) (observing that "[i]nfidelity alone does not preclude a CIR," and with regard to the intent factor, evidence of infidelity is partially counterbalanced where the parties choose to remain together even after the infidelity is revealed).

10

Also, the record contains numerous e-mails and text communications from Sears to Jorgensen in which she refers to Jorgensen using terms of endearment. These include an e-mail from as recently as March 2018 in which Sears addresses Jorgensen as "sweetie" and signs off, "LY," presumably shorthand for "love you." In another e-mail, from March 2019, Sears introduces herself to the seller of a Cle Elum property as Jorgensen's "other half" and asks if the seller would be interested in offering "us" seller financing.

Jorgensen also submitted multiple declarations from friends and family stating that Jorgensen and Sears held themselves out as a couple and behaved outwardly as a married couple would. Jorgensen's mother declared that Jorgensen and Sears "spoke of their immediate and long-term future plans for their lives as any other committed or married couple would." She also declared that she considered Sears her "next daughter-in-law," and that "[w]e all fit together as a family and got along like one." Another witness declared that on one occasion in mid 2018, Sears represented Jorgensen as being her "'husband.'" Yet another recalled that Jorgensen "would often refer to [Sears] as his wife" and that Sears "didn't seem to mind and never corrected [Jorgensen]."

Viewed in the light most favorable to Jorgensen, the evidence in the record supports a determination that the parties' intent and purpose was a marital-like relationship. Cf. Pennington, 142 Wn.2d at 605-06 (purpose factor satisfied upon finding that relationship "included companionship, friendship, love, sex, and mutual support and caring," and finding that parties "functioned as one would expect a

11

married couple to function" tended to support intent factor). Sears points to her attestations below that the parties' relationship never recovered after their 2014 break, and that the two no longer shared physical intimacy after that time. But, "[t]he word 'intimate' in the term 'committed intimate relationship' was not intended to make *sexual* intimacy the litmus test for whether courts should equitably divide property at the end of the relationship." Muridan, 3 Wn. App. 2d at 61. So, "[w]hile courts may consider physical intimacy . . . , it is not required." Id.

Sears also points out that the trial court observed, in granting summary judgment, that "marriage . . . d[id] not appear [to be] a consistent purpose of the relationship." She notes, too, that even after she was free to marry, Jorgensen did not propose again to her, nor did she propose to Jorgensen. Relying on Pennington, Sears argues that these facts support the trial court's summary judgment ruling. But, in Pennington, the court considered one party's refusal to marry in light of the other party's "insistence on marrying." 142 Wn.2d at 604. Here, Sears points to no evidence that either she or Jorgensen refused to marry in the face of the other party's insistence. Furthermore, the Pennington court also observed, with regard to the intent factor, that the party asserting a CIR was repeatedly absent from the other party's home and had a months-long sexual relationship with another person, with whom she resided at one point. Id. at 597, 604. Sears's reliance on Pennington is misplaced.

Turning to the remaining CIR factor—pooling of resources and services for joint projects—reasonable minds could also conclude that this factor supports a CIR. Sears asserts that she paid for the parties' shared living expenses. But, as Jorgensen points out, the record contains evidence that Jorgensen contributed to "the mortgages, utilities, Internet, [television] and [home owners' association] dues" by forgoing income from the detailing business. Jorgensen also declared that at the Cle Elum cabin, he refinished the bathroom, ran power to a shed that the parties purchased and painted, installed outlets and lights on the shed, added a wood stove and installed a chimney, insulated and finished the walls with plywood, and built a lean-to for the parties' snowmobiles. Jorgensen declared further that he redesigned and rebuilt the cabin's deck after a tree fell on the existing deck, purchasing some of the lumber himself. And, even Sears concedes that Jorgensen contributed to cabin's maintenance and general upkeep. She points out that Jorgensen did not contribute any funds toward the cabin, but time and labor, like money, are resources that the court may consider under the resource pooling factor. Cf. Pennington, 142 Wn.2d at 605 (no CIR existed where, among other things, there was an "absence of constant or continuous copayments *or* <u>investment of time and effort</u> in any significant asset" (emphasis added)).

Also, the record supports a determination that Sears and Jorgensen treated the boat detailing business as a joint project toward which they both devoted significant time and resources for their mutual benefit. There is evidence that Sears considered Jorgensen her business partner, that the two discussed using

13

proceeds from the business to retire or purchase a property together, and that Jorgensen contributed substantial time and labor to the business's "hands-on" aspects. Sears contends that Jorgensen was merely an employee who was paid for his labor. But, even assuming that one cannot both pool resources for the benefit of a quasi-community and be a paid employee, the record, as discussed, contains evidence that Jorgensen agreed to forgo income from the business to contribute to the parties' shared expenses.[3]

Sears also argues that the resource pooling factor does not support the existence of a CIR because Jorgensen provided no evidence that his efforts increased the value of any asset. But, Sears cites no authority holding that, for a CIR to exist, the parties' pooling of resources must actually result in pecuniary gain. We are not persuaded that a quasi-community's failure to prosper from its efforts makes it any less a quasi-community.

In sum, construing the evidence and all reasonable inferences therefrom in the light most favorable to Jorgensen, reasonable persons could conclude, under the Connell factors, that Jorgensen and Sears's relationship was a CIR. Consequently, the trial court erred by concluding otherwise as a matter of law and dismissing Jorgensen's petition.

---

[3] Jorgensen has filed a motion to supplement the record with evidence that he was not paid for at least some of his labor. Because that evidence is not needed to fairly resolve the issues on review, we deny the motion. See RAP 9.11(a) (appellate court may direct the taking of additional evidence on review if, among other factors, "additional proof of acts is needed to fairly resolve the issues on review").

14

Sears asserts that we should nonetheless affirm because, "regardless [of] whether the parties were in a [CIR], [Jorgensen] failed to meet his burden of showing the existence of community-like property acquired during the relationship." Specifically, Sears asserts that the property at issue here—the Cle Elum cabin, the Queen Anne condo, and Deckhand Detailing—all constitute her separate property because she acquired them before the alleged CIR began. So, she says, even if there was a CIR, Jorgensen would be entitled, at most, to an equitable lien against Sears's separate property based on the increase in value attributable to Jorgensen's efforts. Therefore, Sears contends, to defeat summary judgment, Jorgensen had to present evidence that his efforts actually increased the value of that property. And, because Jorgensen failed to do so, the trial court did not err by summarily dismissing Jorgensen's petition.

Sears's contentions fail for two reasons.

First, Sears's claim that the cabin, condo, and her interest in Deckhand Detailing each constitute her separate property rests on her claim that that she acquired those assets before the parties began cohabitating. But, although the trial court concluded that "the parties did not begin to cohabitate until 2008," there is conflicting evidence in that regard. As discussed, Jorgensen declared that by June 2007, he and Sears were living together full time in the Cle Elum cabin. So, at least with regard to the condo, which Sears undisputedly did not buy until January 2008, the acquisition date alone may not be determinative of the property's character as separate or community-like. See Muridan, 3 Wn. App. 2d

15

at 56 ("Property acquired during a CIR is presumed to be community-like," but "[t]his presumption may be rebutted.").

Second, and more importantly, the sole issue on which Sears moved for summary judgment below was the existence of a CIR. The "Statement of Issues" in Sears's motion plainly stated that the issue presented was "[w]hether [Sears] is entitled to summary judgment dismissal of Mr. Jorgensen's Petition where he cannot establish that a [CIR] existed between the parties as a matter of law?" (Italics omitted.) Consistent with this statement of the issue, Sears's motion analyzed only the Connell factors and concluded, "Mr. Jorgensen cannot establish that a [CIR] existed as a matter of law when analyzing the Connell factors." To be sure, the trial court apparently believed that to satisfy the resource pooling factor, the party asserting a CIR must establish that the quasi-community's pooled resources created value. The trial court also stated in its order that the pooling factor "is the central factor." But, "[o]ne Connell factor is not more important than another." Pennington, 142 Wn.2d at 605; see also Morgan, 200 Wn. App. at 388 ("[N]o one factor is more important than the others."). And, whether there is pooling so as to support the existence of a CIR is different than the issue Sears now raises, i.e., whether, assuming a CIR exists, there is any community-like property subject to equitable distribution. We therefore decline to affirm on this basis. See RAP 9.12 ("On review of an order granting . . . a motion for summary judgment the

16

appellate court will consider only evidence <u>and issues</u> called to the attention of the trial court." (emphasis added)).[4]

We reverse and remand for further proceedings.[5]

_Appelwick, J._

WE CONCUR:

---

[4] Put another way, while we may affirm on any basis supported by the record, we are not persuaded that this record is the record that would have been presented had Sears sought summary judgment based on Jorgensen's inability to establish a genuine issue of material fact as to property characterization and distribution. Indeed, at oral argument below, Jorgensen argued as follows through counsel: "What the actual determination of what's fair and equitable in terms of a distribution of the accumulations during the relationship, that is an issue for another day. But for summary judgment, it's clear that they were in a committed intimate relationship, and so now we need to get on to the next step with this process." This argument reflects that Jorgensen understood Sears's motion as challenging solely the existence of a CIR.

[5] Because we reverse and remand, we need not address Jorgensen's argument that reversal is required because the trial judge was prejudiced against him. But, to the extent Jorgensen suggests that a different judge is required on remand, he fails to point to any evidence of the trial judge's actual or potential bias. Accordingly, we do not remand to a different judge. See In re Marriage of Meredith, 148 Wn. App. 887, 903, 201 P.3d 1056 (2009) ("A trial court is presumed to perform its functions regularly and properly without bias or prejudice," and to overcome the presumption, "[e]vidence of a judge's actual or potential bias is required."); In re Pers. Restraint of Davis, 152 Wn.2d 647, 692, 101 P.3d 1 (2004) ("Judicial rulings alone almost never constitute a valid showing of bias.").